## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| YOLANDA TRICE, | ) | |
| | ) | No. 11 CV 1939 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | November 9, 2012 |
| Defendant. | ) | |

### MEMORANDUM OPINION and ORDER

Plaintiff Yolanda Trice challenges the Commissioner's denial of her application for Social Security disability benefits ("DIB") and supplemental security income ("SSI"), claiming that the combination of her diabetes, high blood pressure, back and leg pain, asthma, and depression precludes her from working. For the following reasons, Trice's motion is granted insofar as it requests a remand, and the Commissioner's motion for summary judgment is denied.

### Procedural History

Trice previously applied for disability benefits in November 2003 and October 2004. (Administrative Record ("A.R.") 178.) Following a hearing on the 2004 application, an ALJ ("ALJ") denied Trice benefits. (Id.) Trice's request for review was then denied by the Appeals Council on May 12, 2006, but she did not seek judicial review. (Id.) On May 30, 2006, Trice filed her current application for SSI and DIB, alleging that her disability began on January 6, 2006. (Id. at 178, 280-82, 283-85.) The Commissioner denied her applications

in September 2006 (id. at 202-05), and again on reconsideration in December 2006 (id. at 213-15, 216-18). Trice then requested and was granted a hearing before an ALJ. (Id. at 222, 227-30.) On September 17, 2009, the ALJ concluded that she is not disabled as defined under the Social Security Act. (Id. at 178-201.) When the Appeals Council denied Trice's request for review on January 14, 2011 (id. at 1-3), the ALJ's decision became the final decision of the Commissioner, *see Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012). Pursuant to 42 U.S.C. § 405(g), Trice initiated the current suit seeking judicial review of the ALJ's decision. The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

## Background

Trice, who is presently 43 years old, suffers from several physical ailments including diabetes mellitus, hypertension, asthma, back and leg pain, and obesity. She also suffers from major depression, recurrent, and anxiety, which she believes stem from the sexual abuse she suffered as a child and the physical and mental trauma that followed a 2003 police raid that was mistakenly conducted on her residence when she was six months pregnant with her daughter.

### A.    Summary of Medical Evidence

At the hearing before the ALJ, Trice submitted both documentary and testimonial evidence in support of her claim. Beginning in May 2005, Trice began reporting muscle spasms and persistent and severe lower back pain. (A.R. 532.) An examination revealed back tenderness, but a musculoskeletal examination reported normal findings. (Id.) Trice

was given a Toradol injection for the pain and oral medication for her diabetes and hypertension. (Id.) Trice returned for a follow-up visit, still complaining of severe low back pain. (Id. at 531.) She was given another Toradol injection and prescribed Vicodin and Ibuprofen for the pain. (Id.) A CT scan of her lumbar spine revealed mild diffuse disk bulges at multiple levels but no evidence of spinal canal stenosis. (Id. at 558.) For the remainder of 2005, Trice followed up with her doctors, continuing to report back pain and receiving injections to alleviate it. (Id. at 522, 526, 529.) She also sought and received treatment for her diabetes, asthma, hypertension, obesity, and anemia. (Id. at 523-24, 540-41.)

In February 2006, Trice was evaluated at a mental health clinic, reporting depression, insomnia, fatigue, low energy, lack of interest, and poor concentration but denying any suicidal or homicidal ideation. (Id. at 512-21.) Trice told the intake evaluator that she attempted suicide once when she was 20 years old and cut her wrists in 2003. (Id. at 512-13.) Although Trice had "passive thoughts of death," she indicated to the evaluator that she had no intention to act on them. (Id. at 516.) Trice also described her history of sexual abuse as a child, her mother's failure to act on it when she was told about it, and the police raid on her home, all of which continued to cause her emotional trauma. (Id. at 513, 518.) The clinic referred Trice for a formal psychiatric evaluation. (Id. at 521.)

In April 2006, Trice met with a psychiatrist, Dr. Ji Shin, reporting depression, insomnia, loss of appetite, low energy, and lack of interest. (Id. at 505.) She told Dr. Shin about her long history of depression—which had been effectively treated with Prozac—and

3

that she was on medication for her back pain. (Id. at 505-06.) Dr. Shin diagnosed Trice with major depression,[1] recurrent, and identified stressors aggravating her depression as including her history of sexual abuse and current medical problems. (Id. at 509.) Dr. Shin noted Trice's Global Assessment of Function[2] ("GAF") score was then 55 but had been as high as 60 in the past year. (Id.) Dr. Shin prescribed Prozac for Trice's depression and recommended she participate in mental health treatment. (Id. at 504, 510.)

The next day, Trice met with Dr. William Giricz for a follow-up visit, presenting with poorly controlled diabetes, occasional swelling in the extremities, hypertension, and intermittent low back pain. (Id. at 538.) Trice requested a refill on Vicodin for her back pain, but Dr. Giricz declined to prescribe it. He instead refilled Trice's routine medications and prescribed 800 milligrams of Ibuprofen. (Id. at 538-39.) In June 2006, Dr. Shin completed a psychiatric report for Trice's application for disability benefits, diagnosing her

[1] According to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR") at 369, 376, major depression is a mental disorder characterized by the occurrence of one or more major depressive episodes—demonstrated by a depressed mood or the loss of interest in nearly all activities—*id.* at 349, and the absence of any history of manic or hypomanic episodes—an episode characterized by "persistently elevated, expansive, or irritable mood, lasting throughout at least 4 days," *id.* at 368.

[2] The GAF scale is a "hypothetical continuum of mental health-illness" used to determine "psychological, social, and occupational functioning." *See* DSM-IV-TR at 32, 34. The GAF scale has 10 ranges of functioning with scores spanning from 0 to 100. *Id.* A score from 41 to 50 indicates serious symptoms including suicidal ideation or any serious impairment in social, occupational, or school function such as having no friends or an inability to keep a job. *Id.* at 34. A score from 51 to 60 indicates moderate symptoms like a flat affect, occasional panic attacks, or moderate difficulty in social, occupational, or school functioning. *Id.*

with major depression, recurrent, for which Prozac had been prescribed but had resulted in no significant improvement. (Id. at 563-66.) Dr. Shin noted that Trice walked slowly with a cane; that she had "appropriate" clothing, hygiene, and manners; and that she presented with depression, paranoia, insomnia, and severe back pain. (Id. at 563.) Trice maintained that she was unable to work because she was afraid to be around people. (Id. at 563-64.) In the ensuing months, Trice followed up with her doctors regarding her physical ailments, complaining of constant, severe low back pain that radiated to her legs and weakness in her upper extremities. (Id. at 795, 803-06.)

On October 1, 2006, Trice sought emergency care, reporting a loss of appetite, feelings of worthlessness and helplessness, insomnia, and recent suicidal ideation. (Id. at 601-44.) She was admitted to the hospital for three days. Notes from her in-patient stay reveal the exacerbation of her depressive disorder, partly brought on by new psychosocial and financial stressors—including the loss of her apartment, the possibility of moving in with her estranged mother, and her continuing difficulty dealing with the sexual abuse she suffered as a child. (Id. at 671-84, 696-700.) Her treatment notes also reveal that she suffered from severe fatigue and weakness because of anemia, which was treated through an outpatient iron infusion. (Id. at 641-44.) After her discharge, her treating psychiatrist, Dr. Joseph Beck, recommended an intensive outpatient mental health program, which Trice successfully completed. (Id. at 717, 747.) Progress notes from that program show that Trice seemed "upbeat" and had demonstrated an investment in her therapy. (Id. at 736, 738, 747.) Dr. Shin, Dr. Giricz, and Dr. Beck continued to prescribe Prozac for Trice's depression. (Id.

at 795, 800-01, 1003, 1014.)  Although she denied any suicidal ideation, Trice reported that she remained depressed even with medication and that she had become homeless and was staying with a friend.  (Id.)

In November and December 2006, Dr. Shin and Dr. Beck each completed a Mental Impairment Questionnaire ("MIQ").  (Id. at 850-57, 858-65.)  Dr. Shin diagnosed Trice with major depressive disorder, recurrent, diabetes, hypertension, and back pain, noting a current GAF score of 50.  (Id. at 850.)  Dr. Shin identified the following symptoms as demonstrative of this diagnosis: poor memory and appetite; mood and sleep disturbance; emotional lability; pervasive loss of interests; feelings of guilt and worthlessness; difficulty concentrating; suicidal ideation; decreased energy; and intrusive recollections of a traumatic experience. (Id. at 851.)  Dr. Shin noted that despite the daily prescribed dose of 40 milligrams of Prozac and individual therapy, Trice remained depressed, and her prognosis was "guarded."  (Id. at 852.)  Based on her impairments, Dr. Shin opined that Trice had poor to no useful ability to: maintain attention for two-hour segments; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; understand and remember instructions; carry out detailed instructions; deal with the stress of semiskilled and skilled work; and to interact appropriately with the general public.  (Id. at 853-55.)  Dr. Shin noted extreme restrictions of daily living activities; marked difficulties in maintaining social function; frequent deficiencies of concentration, persistence, and pace; and repeated episodes of deterioration or decompensation.  (Id. at 856.)

Dr. Beck diagnosed Trice with major depressive disorder, recurrent, noting a current GAF score of 50, and 55 as the highest score in the past year. (Id. at 858.) Dr. Beck noted many of the same symptoms as Dr. Shin and additional clinical findings of a restricted affect, dysphoria, and fearfulness. (Id. at 859.) He gave Trice a "fair" prognosis and opined that based on her impairments, she had poor to no ability to complete a workday and workweek without interruptions from psychologically-based symptoms, or to respond appropriately to changes in a routine work setting. (Id. at 860, 862.) In contrast to Dr. Shin's evaluation, Dr. Beck noted slight restriction of daily living activities and difficulties in maintaining social function, and one or two episodes of deterioration or decompensation. (Id. at 864.) Like Dr. Shin, Dr. Beck noted that Trice has frequent concentration difficulties. (Id.)

The next year, Trice continued to follow-up with her doctors. (Id. at 1002, 1012-13, 1043, 1061-63.) She complained of broken sleep. (Id. at 1002.) She also reported that she was taking an additional 20 milligrams of Prozac daily and that she intended to have a hysterectomy to resolve her anemia. (Id.) She had also recently received Section 8 housing. (Id.) Following her hysterectomy (id. at 896-99), Trice continued with her mental health treatment (id. at 901-05, 906-12, 1011). When she saw Dr. Shin in August 2007, the doctor reported that Trice's GAF score was 60 and that the severity of her depression and anxiety were mild, but also noted that she had reported suffering an "episode" when she encountered her stepfather, one of her sexual abusers. (Id. at 1010.) Trice also saw Dr. Beck that month who noted that she was "doing well," had a better affect, and was exhibiting less dysphoria. (Id. at 1001.) During the visit, Trice reported experiencing panic episodes after encountering

a family member who had sexually abused her. (Id.) Dr. Beck recommended counseling and prescribed medications to help her sleep. (Id.) Trice had a follow-up with Dr. Shin in November, complaining of "feeling sluggish" and pain in her left leg. (Id. at 1009.) Dr. Shin noted a GAF score of 60 and described the severity of Trice's symptoms as mild. (Id.)

Trice continued her treatment throughout 2008. (Id. at 982-84, 1008, 1065-66.) In May, Trice complained of severe pain in her left calf. (Id. at 980-81.) A Doppler scan revealed no evidence of deep venous thrombosis, but an EMG—a test that measures the electrical activity of muscles—suggested evidence of left S1 (L5) chronic radiculopathy. (Id. at 985, 987.) In July, Trice underwent an assessment of her treatment plan. (Id. at 1032-42.) She reported depression, fatigue, anger, paranoia, and low back pain, and at that time, was taking a number of medications including Trazodone—which she reported was effective—Prozac, Seroquel, Lexapro, and Ambien. (Id. at 1032-33.) The case manager assessed Trice's GAF score as 65 and described her demeanor as "cooperative" and appearance as well-groomed. (Id. at 1033, 1035.) Continued treatment, including individual or group counseling, was recommended. (Id. at 1041-42.) Trice also saw Dr. Shin that month, reporting increased symptoms such as mood swings, insomnia, and depression. (Id. at 1007.) Dr. Shin assessed her GAF as 60 and prescribed Seroquel, Lexapro, and Ambien. (Id.)

In October 2008, Dr. Shin completed a second MIQ, diagnosing Trice with major depression, recurrent, diabetes, hypertension, and chronic back pain, and noting a "guarded" prognosis. (Id. at 997-1000.) Dr. Shin noted many of the same findings as in his November

2006 MIQ, but added poor to no ability in Trice's ability to: understand, remember, and carry out very short and simple instructions; maintain regular attendance; make simple work-related decisions; get along with co-workers; respond appropriately to changes in a routine work setting; and deal with normal work stress. (Id. at 999.) Dr. Shin further opined that Trice would experience extreme difficulties in maintaining social functioning; constant deficiencies of concentration, persistence, or pace; and continual episodes of deterioration or decompensation. (Id. at 1000.)

A few months later, in January 2009, Dr. Shin wrote a letter explaining that he had treated Trice since April 2006 and diagnosed her with major depression that required daily medication. (Id. at 1023.) Dr. Shin opined that Trice was unable to work because of her physical problems—diabetes, hypertension, and chronic back pain—and the symptoms of her depression—poor concentration, forgetfulness, sad and irritable moods, difficulty with understanding simple instructions, and getting along with supervisors and co-workers. (Id.)

**B.    Trice's Testimony**

At the hearing before the ALJ, Trice began by testifying about her physical ailments. According to Trice, she is unable to work because of nerve damage in her left leg, caused by an injury she sustained in 2003 after the police attacked her in her home while executing a warrant on the wrong residence. (A.R. 107-11.) She stated that she suffers severe pain in her back and left leg, affecting her knee and her ankle. (Id. at 117-18.) Her left leg and knee "buckle[ ]" after standing for 15 to 20 minutes, and the pain is exacerbated by changes in the weather and when prolonged pressure is placed on her knee. (Id. at 107, 119, 148.) To

alleviate the pain, Trice takes a variety of pain medications, including several 600 or 800 milligrams of Motrin daily, along with 500 or 750 milligrams of Vicodin every other night. (Id. at 120-21.) Trice testified that the Vicodin works best for her leg pain, but it makes her sleepy so she cannot take it during the day, and in any event, the doctors discontinued this medication. (Id.) Trice also suffers from back pain, sometimes so severe she cannot get out of bed. (Id. at 121-22). She takes Naproxen that "helps" to ease the pain, but which she must take continually because the pain relief wears off. (Id. at 123.) Despite these medications, Trice stated that her pain remains severe. (Id. at 119-23.) She underwent a course of prescribed physical therapy, but found it not to be beneficial. (Id. at 113-14.) Trice testified that she currently weighs between 200 and 215 pounds. (Id. at 124.) She also testified that she smokes a pack per week to stay calm. (Id. at 124-25.)

Trice testified that because of these ailments, she suffers certain restrictions. She cannot lift 50 pounds or a case of soda but can lift a gallon of milk. (Id. at 147-48.) She can only stand for 15 to 20 minutes before she experiences left knee pain and must sit down. (Id. at 148.) She uses a cane to walk even short distances, get out of bed, and steady herself while standing, and estimated that it would take her an hour to walk even a short block. (Id. at 148-49.) She is comfortable sitting if she can get up and stretch her legs from time to time. (Id. at 149-50.) And she experiences occasional hand cramps that she attributes to complications from her diabetes, but she added that the strain eases after a few minutes. (Id. at 150.)

Trice also described her mental difficulties. She testified that she is unable to work because she believes that people judge her and make fun of her because of her appearance. (Id. at 107.) According to Trice, she has always had emotional problems stemming from her history as a victim of childhood sexual abuse. (Id. at 128, 132.) She stated that three men, including her stepfather, and a woman, sexually abused her when she was a child, and when she told her mother about the abuse, her mother did not believe her. (Id. at 132, 151.) Trice and her mother have been estranged ever since. (Id. at 151.) Trice testified that she remembers the abuse and thinks about it constantly, and as a result, she has difficulty focusing, concentrating, and remembering things. (Id. at 151-52.) Trice stated that if not for her daughter, she would stay in bed all day. (Id. at 152.)

Trice also described the extensive treatment she has pursued for her depression that has included ongoing counseling with her treating psychiatrists, Dr. Beck and Dr. Shin, an in-patient hospitalization because of suicidal thoughts, and brief participation in intensive out-patient treatment following that hospital admission. (Id. at 128-32, 134.) Trice explained that the suicidal thoughts occurred at a time when she was homeless, and that she has not had any such thoughts since then in large part because of her daughter and her desire to care for her. (Id. at 127-31.) Trice testified that she did not find the in-patient treatment to be helpful, noting that during her hospitalization, she did not improve but rather lied to the doctors so that they would release her. (Id. at 130-32.) She added, however, that her emotional state has improved, and the treatment and medications have helped so that she no longer has suicidal thoughts or constant anger. (Id. at 131.) She also noted that she has

benefitted from attending a therapy group of victims of childhood sexual abuse. (Id. at 131-32.)

Trice testified that she and her five-year-old daughter live in a rented house, and that the rent is covered through a Section 8 subsidy. (Id. at 76, 78.) Prior to that, she was homeless for nine months. (Id. at 76.) Trice stated that she currently has no sources of income. (Id. at 78.) She receives food stamps and a medical card from the welfare department but was denied cash assistance because she could not participate in a required welfare to work program. (Id. at 78-79.) Trice testified that she used the $51,000 settlement that she obtained from a personal injury lawsuit against the police department to pay for rent and bills and to buy clothes and a car. (Id. at 79-80.)

Trice testified that she is, and always has been, her daughter's primary caretaker. On days that her daughter attends school, Trice wakes up at 5:00 a.m. to get her ready. (Id. at 140-41.) Before her car was damaged in October 2008 (id. at 84-86), Trice drove her daughter to and from school (id. at 142). Trice has since arranged for a parent of another child to drive her daughter to school. (Id. at 142-43.) When her daughter returns from school around 12:15 p.m., they spend the afternoon together. (Id. at 143.) Trice testified that she prepares her daughter's meals, reads to her, and does all the housework, albeit slowly because she requires numerous breaks. (Id. at 142-43.) She takes her daughter to the doctor, attends school functions, and does light grocery shopping for items she can carry like bread and milk. (Id. at 144-45.) She also gets help from others. Her nephew's mother T.J. will sometimes do the laundry, and T.J. and Trice's cousin Tonya will help buy the heavier items

at the store.  (Id. at 145.)  When her daughter is at school, Trice "lay[s] around and sleep[s]."

(Id. at 146.)

## C.     Vocational Expert's Testimony

Vocational expert ("VE") Michelle Peters described Trice's past relevant work as a

cashier, data entry clerk, and mail clerk as ranging from unskilled to semiskilled in nature

and from light to sedentary in physical demand.  (A.R. 154-55.)  The ALJ asked the VE to

consider a hypothetical individual with Trice's age, education, and work experience who is

capable of performing the full range of light work and can occasionally climb ramps and

stairs, stoop, and crouch.  (Id. at 155.)  The ALJ added that this individual cannot: perform

constant, repetitive pushing or pulling against resistence with her left lower extremity; climb

ladders, ropes or scaffolds; work on moving or unstable surfaces; kneel or crawl; and perform

work exposing her to concentrated respiratory irritants, unprotected heights, or unguarded

hazardous equipment.  (Id.)  The VE testified that this individual can perform Trice's past

work as a data entry clerk, a teller, and a retail cashier.  (Id. at 155-56.)

When the ALJ asked whether any positions exist for the hypothetical individual who

had the same postural limitations but was limited to sedentary work, the VE replied that a

data entry clerk position would be available.  (Id. at 156.)  When asked by the ALJ whether

any occupations existed for an individual who is limited to simple, repetitive, unskilled work

at the light level, the VE responded that these limitations would eliminate Trice's past

relevant work but that 1,500 assembler jobs, 1,200 hand packaging jobs, and 1,000 sorter

jobs would be available.  (Id. at 156-57.)  The ALJ modified the hypothetical again, asking

the VE whether any simple, unskilled occupations exist at the sedentary level. (Id. at 157.) The VE answered that 900 assembler jobs, 850 hand packaging jobs, and 850 inspector jobs would be available. (Id.) The VE then confirmed that there was no significant difference between her descriptions of these occupations and the descriptions in the *Dictionary of Occupational Titles* ("DOT"). (Id.) The VE also confirmed that to perform the tasks required of these occupations, an individual must be on task 82% of the day, and if the individual was distracted frequently by pain, fatigue, or depression, that would eliminate all competitive work. (Id. at 157-58.) On cross-examination, the VE added that if the individual were to find simple, repetitive work stressful and thus was unable to stay on task, such limitations would preclude any work. (Id.)

**D.    The ALJ's Decision**

In evaluating Trice's claim, the ALJ applied the standard five-step sequential inquiry for determining disability, which required her to analyze whether:

> (1) the claimant has engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the claimant's severe impairment meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) the claimant can perform her past work; and (5) the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)). If the ALJ finds at step three that the claimant has a severe impairment that does not equal one of the listed impairments, she must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence" before moving on to step four. 20 C.F.R. § 404.1520(e). A claimant's residual

14

functional capacity ("RFC") is the "most [she] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).  The ALJ then uses the RFC to determine at steps four and five whether the claimant can return to her past work or different available work in the national economy.  20 C.F.R. § 404.1520(e)-(g).  The claimant bears the burden of proof at steps one through four, but if the claimant meets that burden, the burden shifts to the Commissioner at step five. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). There, the Commissioner must demonstrate that the claimant—in light of her age, education, job experience and RFC to work—is capable of performing other work and that such work exists in the national economy.  20 C.F.R. § 404.1520(g).

The ALJ made the following findings: (1) Trice had not engaged in substantial gainful activity since January 6, 2006; (2) her obesity, diabetes, back and leg pain, and depression and anxiety constitute severe impairments and her hypertension, high cholesterol, anemia, and asthma constitute  non-severe impairments; (3) these impairments do not individually or collectively meet or medically equal any of the listings; (4) Trice has the physical RFC to perform a wide range of sedentary work and the mental RFC to perform and sustain simple, repetitive, unskilled work; and (5) based on these RFC's, although she cannot perform any past relevant work, there are jobs that exist in significant numbers in the national economy that she can perform, namely that of assembler, hand packager, and sorter/inspector.  (A.R. 180-201.)  Based on these findings, the ALJ concluded that Trice is not disabled as defined by the Act, and denied her benefits.  (Id. at 201.)

**Analysis**

Trice challenges the ALJ's decision in three respects. Trice first contends that the ALJ erroneously assessed her mental RFC by finding that she has the capacity to perform simple, repetitive, unskilled work. Such a finding, Trice argues, is not supported by substantial evidence. Even if it were, Trice asserts that the ALJ committed reversible error by declining to ask the VE to consider the availability of jobs in the economy with her limitations on concentration, persistence, and pace. Trice next challenges the ALJ's credibility determination, claiming that the ALJ failed to adequately explain her findings. Finally, Trice argues that the ALJ erred in her step-five determination by failing to investigate inconsistencies between the VE's testimony and the DOT.

This court reviews the ALJ's legal decisions de novo and her factual decisions deferentially, reversing only if they lack the support of substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Clifford*, 227 F.3d at 869 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This court may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner." *Clifford*, 227 F.3d at 869. But a remand is warranted if the Commissioner's decision lacks the requisite evidentiary support, "is so poorly articulated as to prevent meaningful review," *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002), or fails to "provide an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled," *Craft*, 539 F.3d at 673 (internal quotation marks omitted).

**A.      The ALJ's RFC Assessment**

In concluding that Trice has the mental RFC to perform and sustain simple, repetitive, unskilled work, the ALJ determined that she can understand, remember, and carry out simple, routine instructions; can respond appropriately to supervisors, coworkers and usual work situations; and can adapt to the type of changes that would be expected in a typical work setting. (A.R. 186.) Also, according to the ALJ, Trice would be distracted only rarely by symptoms to the extent that she was off task and not productive. (Id.) Trice mounts several challenges to the sufficiency of this finding. She argues that the ALJ improperly disregarded the opinions of her treating psychiatrists, Dr. Shin and Dr. Beck. This error, Trice contends, led the ALJ to erroneously find only mild restriction in activities of daily living; mild difficulties in social functioning; and mild limitations in the ability to sustain concentration, persistence, and pace for routine or simple tasks. She also claims that the ALJ failed to consider the combination of her mental and physical impairments and specifically failed to consider her anemia, leg swelling, and bilateral extremity paresthesias, which would have added limitations to her physical RFC. Finally, Trice asserts that the ALJ erred in omitting her mild limitations in concentration, persistence, and pace from the hypothetical questions posed to the VE, instead limiting her questioning to simple, repetitive, and unskilled work.

### 1. The Treating Physician Rule

The court begins with Trice's challenge to the ALJ's mental RFC finding. She first argues that the ALJ improperly declined to give controlling weight to either of the opinions offered by her treating psychiatrists, Dr. Shin and Dr. Beck. The treating physician rule "directs the [ALJ] to give controlling weight to the medical opinion of a treating physician

if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (internal quotation marks omitted); *see also* 20 C.F.R. § 404.1527(d)(2). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). But if the treating physician's opinion is contradicted by other well-supported evidence, then it is no longer entitled to controlling weight and "is just one more piece of evidence for the [ALJ] to weigh." *Bauer*, 532 F.3d at 608 (internal quotation marks omitted). In determining the weight to afford the treating physician's evidence, the ALJ may then consider factors such as the length, frequency, and nature of the treatment relationship, the level of expertise the physician has in the condition claimed to be disabling, the supportability of the opinion, and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 404.1527(d).

Here, the ALJ gave "some credit" to Trice's treating psychiatrists' opinions, noting that Trice "is limited by her emotional problems in the ability to perform and sustain complex or detailed tasks," but that "based on the record as a whole," Trice is able to sustain simple, repetitive, unskilled work. (A.R. 194-95.) The ALJ rejected Dr. Shin's and Dr. Beck's mental RFC opinions on two grounds. One, they prepared their 2006 opinions shortly after commencing treatment with Trice and at a time when they accepted her claims that she was compliant with prescribed antidepressant medication. The ALJ noted that Trice's claims were contrary to pharmacy records demonstrating that she was not regularly filling that

medication. (Id. at 183-84, 194-95.) Second, the ALJ rejected Dr. Shin's 2008 RFC opinion, which reflected substantial deterioration in Trice's mental condition, because it was not well-supported by his contemporaneous GAF assessments, progress notes, and the medical record. (Id. at 195.) Specifically, the ALJ noted that at most of Trice's office visits with Dr. Shin, Trice's GAF score was stable at 60, suggesting "a far lesser degree of limitation caused by emotional problems than the marked and extreme limitations Dr. Shin endorsed." (Id. at 183.) The progress notes, the ALJ explained, show that Trice was doing well and benefitting from the medication, and Dr. Shin continued the same medication and dosage, corroborating the conclusion that Trice's condition was stable. (Id.)

The court disagrees with Trice that the ALJ improperly disregarded Dr. Shin's RFC opinions. The ALJ correctly noted that Dr. Shin and Dr. Beck provided their 2006 mental RFC opinions after only treating Trice for a short time. This length of treatment was an appropriate consideration in determining what weight to assign to the doctors' opinions. 20 C.F.R. § 404.1527(c)(2)(i). And, as the Commissioner points out, in discounting the RFC's based on the prescription discrepancy, it is clear from the ALJ's opinion that she carefully examined the record to determine which of Trice's prescriptions she filled and when. (A.R. 186-94.) Trice claims that the ALJ's conclusions on this point are faulty because the pharmacy records the ALJ relied on were incomplete. But after the hearing, Trice's counsel produced additional computerized records from various pharmacies, which the ALJ thoroughly examined. Moreover, the ALJ questioned Trice about whether she consistently took her medications, and Trice admitted that she did not always fill her prescriptions and

that her symptoms worsened when she did not take her medication. (Id. at 136.) Finally,

Trice has not pointed to any evidence refuting the ALJ's observation that Dr. Shin's 2008

mental RFC was inconsistent with his own GAF assessments, progress notes, and other

medical record evidence, all of which demonstrated that Trice's mental condition stabilized

after 2006. *See Knight*, 55 F.3d at 314 ("Medical evidence may be discounted if it is . . .

inconsistent with other evidence.").

### 2. Trice's Mental Functional Limitations

Although the ALJ did not misapply the treating physician rule, the court finds that

Trice's claims challenging the bases of the ALJ's mental RFC have traction. After rejecting

Dr. Shin's opinions, the ALJ determined that Trice has the mental RFC to perform and

sustain simple, repetitive, unskilled work. (A.R. 186.) The ALJ's mental RFC reflected the

degree of functional limitations she found in the following areas:[3] (1) mild restriction in

activities of daily living; (2) mild difficulties in social functioning; (3) mild limitations in the

ability to sustain concentration, persistence, and pace for routine or simple tasks; and (4) one

---

[3] At step two, after an ALJ determines that a claimant has a medically determinable mental impairment, the ALJ applies a "special technique" to rate the degree of functional limitation in four broad areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3); *see also Craft*, 539 F.3d at 674. These four functional areas correspond to the requirements of "paragraph B," 20 C.F.R. part 404, subpart B, appendix 1, § 12.00 *et seq.*, of the SSA's mental impairment listings. *Craft*, 539 F.3d at 674. "If the ALJ rates the first three functional areas as none or mild and the fourth area as none, then generally the impairment is not considered severe." *Id.* at 675. "Otherwise, the impairment is considered severe, and the ALJ must determine whether it meets or is equivalent in severity to a listed mental disorder." *Id.* "If the mental impairment does not meet or is not equivalent to any listing, the ALJ will assess the claimant's RFC." *Id.*

or two episodes of decompensation, each of extended duration.[4]  (Id. at 184-86.)  The ALJ's decision fails to establish the required logical bridge regarding the first three areas.

First, in concluding that Trice has mild limitations in activities of daily living, the ALJ pointed to the fact that Trice is her daughter's primary caretaker and that she independently maintains the household with the exception of the heavy household chores for which she requires help.  (Id. at 184.)  But the ALJ failed to sufficiently explain her equating of Trice's daily activities like preparing meals for her daughter and slowly doing household chores to engaging in the rigors of full-time employment.  *See, e.g.*, *Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010) ("[A]n ability to engage in 'activities of daily living' (with only mild limitations) need not translate into an ability to work full time."); *see also Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) (stating "[claimant's] ability to struggle through the activities of daily living does not mean that she can manage the requirements of a modern workplace"); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("We have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home.").

Next, citing Trice's close relationship with her daughter, her positive interaction with her cousin and friend who provide her with assistance, her ability to make transportation

___

[4]  SSR 96-8p explains that the "functions" described in the paragraph B criteria of Listing 12.00 (mental disorder), which forms the basis of the special technique, can establish an RFC when an ALJ provides a "detailed assessment" of those functions.  SSR 96-8p, 1996 WL 374184, at *4.  The ALJ seemed to have believed that her analysis of these functional limitations at step two was sufficient to satisfy this requirement, and neither party challenges whether the ALJ sufficiently incorporated these functional limitations into the mental RFC finding.

arrangements for her daughter, her ability to get along with her case worker, and positive peer interaction in the intensive outpatient program, the ALJ found only mild difficulties in social functioning and mild limitations in her ability to sustain concentration, persistence, and pace for routine or simple tasks. (A.R. 185.) But again, the ALJ's opinion is lacking in how these abilities translate into an ability to "perform sustained activities in an ordinary work setting on a regular and continuing basis (i.e. 8 hours a day, for 5 days a week)." *See* SSR 96-8p, 1996 WL 374184, at *7 (requiring "narrative discussion describing how the evidence supports each conclusion"). As Trice points out, getting along with family members who provide assistance, making transportation arrangements, and getting along with medical providers for short periods of treatment are not necessarily indicative of an individual's ability deal with others in a work environment on a daily basis. The deficiencies in the ALJ's discussion compels the conclusion that her mental RFC opinion fails to build a logical bridge in these respects, and remand is necessary.

### 3. Combination of Impairments

The court however rejects Trice's argument that the ALJ failed to consider the combination of her physical and mental impairments, and specifically failed to consider her anemia, leg swelling, and bilateral extremity paresthesias, which would have added limitations to her physical RFC. Trice correctly explains that an ALJ is required to consider the combined effect of a claimant's impairments, including those impairments that are not severe. *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004); 20 C.F.R. § 404.1523. But the ALJ specifically noted that she considered Trice's limitations from all severe and non-

22

severe impairments when assessing her RFC. (A.R. 181.) The ALJ was "not required to address every piece of evidence," *Clifford*, 227 F.3d at 872, and the ALJ's opinion in this case shows that she considered the combined impact of Trice's impairments. *See Richison v. Astrue*, 462 Fed. Appx. 622, 626 (7th Cir. 2012).

Nor does this court agree that the ALJ failed to properly account for Trice's anemia, or other physical impairments. The record shows that Trice underwent a hysterectomy to resolve the bleeding that was causing her anemia and has not required any iron transfusions since then, effectively treating the condition with iron pills. (Id. at 125-26, 896-99.) Trice has not pointed to any evidence in record that she continues to suffer any symptoms from anemia after her surgery. As for the bilateral extremity paresthesias in Trice's upper and lower extremities that Dr. Giriciz documented in August 2006, he noted that the paresthesias appeared on an intermittent basis and was mild in intensity. (Id. at 803–06.) And again, Trice has not pointed to any evidence that she continues to suffer limitations from that impairment. Finally, regarding the leg swelling, Trice offers only a brief statement that a limitation to sedentary work does not account for the pain that she experiences as a result of this and the other conditions. Because Trice has not developed this argument and has not pointed to anything demonstrating that the ALJ's physical RFC determination was not supported by substantial evidence, the court rejects that argument.

### 4. The Hypothetical Questions

Trice next argues that the ALJ erred in failing to include her limitations on concentration, persistence, and pace in her hypothetical questions to the VE. The ALJ is

required "to orient the VE to the totality of a claimant's limitations," including deficiencies of concentration, persistence, and pace. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). Accordingly, "the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical" questions. *Id.* Limiting a claimant to simple, repetitive, unskilled work in a question posed to the VE is generally insufficient to account for difficulties with concentration, persistence, and pace unless an exception to the general rule applies. *Id.* at 619-20 (collecting cases).

The first exception applies when "the record shows that the VE independently reviewed the medical record or heard testimony directly addressing [the at issue] limitations." *Id.* at 619. But this exception does not apply where "the ALJ poses a series of increasingly restrictive hypotheticals to the VE" for in those situations, the court "infer[s] that the VE's attention is focused on the hypotheticals and not on the record." *Id.* (internal citations omitted). The second exception applies where "it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *Id.* This exception, however, is limited to cases, where "a claimant's limitations were stress- or panic-related and the hypothetical restricted the claimant to low stress work." *Id.*

The Commissioner does not invoke these exceptions, but instead argues that the ALJ thoroughly articulated her rationale and that the RFC finding is supported by the record. This argument, however, fails to address Trice's chief complaint regarding the ALJ's omission in the hypothetical posed to the VE. In any event, this court need not address whether any

exception applies since remand is warranted on the ALJ's mental RFC finding, which failed to build a logical bridge between her conclusions regarding Trice's mental limitations and the evidence. The court notes however as Trice points out, and the Seventh Circuit has reiterated, asking VEs to consider only simple, repetitive, unskilled work is generally insufficient to address limitations of concentration, persistence, and pace. *Id.* at 619-20. The purpose of including these impairments in hypothetical questions is "to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." *Id.* at 620-21.

Here, because none of the hypotheticals referenced Trice's difficulties with concentration, persistence, or pace (even though the ALJ found them to be mild), it is unclear to the court that the VE was sufficiently focused on specific jobs Trice could perform with these limitations. The VE testified that the hypothetical individual described by the ALJ could perform the sedentary, unskilled jobs of assembler, hand packager, and inspector, but the court cannot determine whether the VE identified these jobs because they are sedentary— a term which refers to a claimant's ability to exert herself physically over a workday or workweek, *see* 20 C.F.R. § 404.1567—and unskilled—defined as "work which needs little or no judgment to do simple duties," 20 C.F.R. § 404.1568(a)—or whether someone like Trice, who has mild difficulties with concentration, persistence, and pace due to depression, can perform them. *See Jelinek v. Astrue*, 662 F.3d 805, 813–14 (7th Cir. 2011) (collecting cases). Accordingly, the ALJ should address this issue with the VE on remand.

**B.    The ALJ's Credibility Determination**

This court affords an ALJ's credibility determination "considerable deference," *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006), overturning it only when it is "patently wrong," *Craft*, 539 F.3d at 678. Such deference is given because it is recognized that the ALJ, having had the opportunity to observe the claimant testify, is in a "better position" to evaluate credibility. *Briscoe v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005). But where the credibility determination is based on objective rather than subjective considerations, an ALJ is in no better position, and the reviewing court has greater freedom to review the ALJ's finding. *See Craft*, 539 F.3d at 678. In either case, the ALJ must connect her credibility determination to the record evidence by an "accurate and logical bridge." *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010) (internal quotation marks omitted).

Trice challenges the ALJ's adverse credibility determination on the following grounds: (1) regarding her constant back and leg pain, the ALJ stated that "the objective medical evidence [did] not show the type or severity of abnormalities that would be expected to cause such severe complaints" but failed to explain what additional limitations Trice should be experiencing; (2) in evaluating her pain, the ALJ failed to consider Trice's obesity; and (3) the ALJ implied that Trice's daily activities and role as her daughter's primary caretaker exceeded her claimed-of limitations.

The Commissioner defends the ALJ's credibility determination by arguing that she reasonably: (1) observed that Trice's appearance at the hearing—she was wearing a dirty, torn, and stained large white tee-shirt and flannel pajama pants—was inconsistent with prior

descriptions of her appearance by her treating and examining physicians as well-groomed, neat, and clean (A.R. 511, 515, 563, 626, 700, 1033); (2) discredited Trice's testimony that she may have missed medical appointments because she lacked transportation based on her additional testimony that she was driving a car up until three months before the hearing; (3) rejected Trice's explanation for a six-month gap in her treatment—that she feared that her doctor would "lock" her up—based on progress notes from her visit just prior to the treatment gap where she reported no significant difficulties and experienced only mild symptoms; and (4) discounted Trice's complaints of constant and severe back and leg pain because they were inconsistent with the medical evidence.

An ALJ is not permitted to "disbelieve [a claimant's] testimony solely because it seems in excess of the 'objective' medical testimony." *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) (internal citation omitted). As the Commissioner correctly notes, that was not the sole basis for the ALJ's disbelief of Trice's testimony regarding her limitations. But the flaw in the Commissioner's defense is that while some of the factors the Commissioner cites *may* have been reasonable bases on which to question Trice's credibility, the ALJ's discussion of these factors is inadequate to uphold her credibility determination in toto.[5]

To build the required logical bridge for a credibility determination, SSR 96-7p requires that the ALJ consider not only the objective medical evidence, but also the

---

[5] Contrary to Trice's assertion, the ALJ considered Trice's obesity and the effect of it on her limitations in compliance with SSR 02-1p. (A.R. 181-82.)

claimant's daily activity, the duration, frequency, and intensity of pain, any precipitating and aggravating factors, the dosage, effectiveness, and side effects of medication, and functional restrictions. 1996 WL 374186, at *3; *accord Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009) (per curiam). Here, the ALJ did not build the required logical bridge between the evidence and her determination of Trice's credibility. First, as discussed above, the ALJ implied that Trice's daily activities exceeded her limitations, but she failed to adequately explain why this was the case. Nor did the ALJ adequately explain how those activities demonstrated an ability to sustain full-time employment. *See e.g., Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) ("The ALJ should have explained the 'inconsistencies' between [the claimant's] activities of daily living (that were punctured with rest), his complaints of pain, and the medical evidence.").

Moreover, the ALJ's opinion lacks "specific reasons" and adequate explanation for her rejection of Trice's allegations of disabling pain. *See* SSR 96-7p, 1996 WL 374186, at *2. Although the ALJ noted that Trice rarely needed narcotic-strength medication, the record, and indeed, the ALJ's opinion, demonstrates that Trice consistently filled prescriptions for a number of other pain relievers (id. at 194), corroborating her assertions of constant pain. *See id.* at *7 (persistent attempts to obtain relief of pain "may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms"). There is also the open question of whether Dr. Giricz declined to refill Trice's Vicodin prescription (A.R. 538-39), because he was concerned about drug abuse or because she did not need this level of

narcotic-strength medication for her pain. Most importantly, the ALJ's finding is seemingly based, in part, on her belief that Trice has not consistently complained to her treating physicians of constant and severe back and leg pain since 2003. But such an observation is contradicted by the record, which contains ample evidence of Trice reporting such pain to her medical providers throughout the years. (*See e.g.*, id. at 522, 526, 529, 532-33, 538, 558, 563, 803-06, 980, 985, 987, 1009). These unexplained gaps in the ALJ's opinion compel the conclusion that she did not create the requisite logical bridge between her credibility determination and the medical evidence.

**C.     The ALJ's Step Five Determination**

Finally, Trice challenges the ALJ's step-five determination, arguing that it was not supported by substantial evidence. Trice first points to the VE's failure to provide specific DOT codes for the occupations she referenced during her testimony, which according to Trice, was harmful because the VE's testimony conflicted with the DOT. She then argues that a remand or reversal is warranted because the ALJ failed to comply with SSR 00-4p's mandate requiring the VE to explain the inconsistencies between her categorization of the exertional levels of the occupations she listed and the DOT.

SSR 00-4p imposes on the ALJ an "affirmative responsibility" to ask whether a VE's evidence "conflicts with information provided in the DOT" before relying on that evidence to support a determination denying benefits. 2000 WL 1898704, at *4; *see Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008) (per curiam). SSR 00-4p then imposes an additional obligation on the ALJ: if the evidence from the VE "appears to conflict with the DOT," the ALJ must "obtain a reasonable explanation for the apparent conflict." 2000 WL 1898704, at *4; *see Overman*, 546 F.3d at 463; *see also Prochaska*, 454 F.3d at 735. Conflicts are apparent if they are "so obvious that the ALJ should have picked up on them without any assistance." *Weatherbee*, 649 F.3d at 570 (quoting *Overman*, 546 F.3d at 463).

When asked at the hearing if any simple, unskilled positions could be performed at the sedentary level, the VE stated that 900 assembler jobs, 850 hand packaging jobs, and 850 inspector jobs fit the bill. (A.R. 157.) The ALJ then asked the VE whether her testimony was consistent with the DOT, and the VE confirmed that there were no significant

differences. (Id.) On cross-examination, Trice's counsel asked whether any jobs would be available for a hypothetical individual who found simple, repetitive, unskilled work to be extremely stressful. (Id. at 158-59.) The VE responded that if the individual was unable to stay on task because of stress, no employment would be available. (Id. at 159.) Counsel concluded her examination without challenging the VE's description of the exertional levels of the occupations or requesting DOT codes for those occupations.[6] (Id.) The ALJ ultimately accepted the VE's testimony, concluding that despite Trice's impairments, she is able to work in a significant number of positions. (Id. at 200.)

Trice now questions the accuracy of the VE's testimony. Trice asserts that the exertional demands of a hand packager do not meet the DOT definition of "sedentary" work as the VE testified, but is rather an occupation that requires "medium" exertion. *See* Dep't of Labor, *Dictionary of Occupational Titles* (4th ed. Rev. 1991), DICOT § 920.587-018, 1991 WL 687916. Nor, Trice alleges, do the occupations of inspector or assembler qualify as sedentary work as the VE testified because the DOT describes them as requiring "light" exertion. *See* DICOT § 589.387-010, http://www.oalj.dol.gov/libdot.htm (last visited on Nov. 6, 2012); DICOT § 780.684-062, 1991 WL 680789. The Commissioner does not dispute Trice's characterization of the exertional demands of these occupations.

It is clear that the ALJ complied with SSR 00-4p's first directive. The ALJ asked the VE if her testimony was consistent with the DOT and the VE answered (wrongly as it turned

---

[6] Although Trice correctly states that the VE did not provide DOT codes for these occupations, that argument does not get her very far for SSR 00-4p does not require specific DOT codes.

out) that it was. The question then becomes whether the conflict between the VE's testimony and the DOT was apparent. *See Overman*, 546 F.3d at 463 ("SSR 00-4p requires only that the ALJ investigate and resolve *apparent* conflicts between the VE's evidence and the DOT.") (emphasis in original). If so, then the ALJ was required to investigate further.

It is not clear that the conflicts that Trice identifies are so obvious that the ALJ's narrow duty to investigate apparent conflicts was triggered. *Compare Overman*, 546 F.3d at 463-64 (finding apparent conflict where VE gave different answers regarding whether jobs were available for similar hypotheticals on direct and cross-examination); *with Merritt v. Astrue*, ___ F.Supp.2d ___, 2012 WL 2576327, at *14 (N.D. Ill. 2012) (finding no obvious conflict where occupations VE identified as requiring frequent reaching and handling were inconsistent with non-dominant left arm limitations); *Russell v. Astrue*, No. 09 C 5702, 2012 WL 645937, at *17 (N.D. Ill. Feb. 24, 2012) (finding no apparent conflict where ALJ asked whether jobs exist for an individual who could perform only sedentary work with a sit/stand option but DOT describes sedentary work as including occasional standing and walking). Here, Trice's counsel had the opportunity to, and in fact did, cross-examine the VE but failed to point to any inconsistences between the VE's testimony and the DOT. *See Slaughter v. Astrue*, No. 08 C 2776, 2010 WL 4625079, at *21 n.23 (N.D. Ill. Nov. 5, 2010) (assuming that even if discrepancy existed, conflict was not apparent where claimant failed to "point to anything in the record that would have given the ALJ any inkling of a conflict between the VE's testimony and the DOT"). Moreover, nothing in Trice's testimony raised an apparent conflict with the VE's testimony. Nor has Trice suggested that the conflict was so obvious

that the ALJ should have been aware of it. *See Stark v. Astrue*, 278 Fed. Appx. 661, 667 (7th Cir. 2008).

In any event, because this court has already determined that remand is necessary, Trice will have the opportunity on remand to raise these potential conflicts, and the ALJ may, if necessary, consider additional testimony from the VE to resolve them. *See Russell*, 2012 WL 645937, at *17. The court declines Trice's request to award benefits at this time. That outcome is appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415, 417-18 (7th Cir. 2011); *see also Briscoe*, 425 F.3d at 356-57. Given the unresolved factual issues here, such a conclusion is not supported by this record.

## Conclusion

For the foregoing reasons, Trice's motion for summary judgment is granted insofar as it requests a remand, and the case is remanded to the ALJ for further proceedings consistent with this opinion.

**ENTER:**

_Young B. Li_ _____

Young B. Kim
United States Magistrate Judge

34